IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION


10/12/2016

| | | | |
|---|---|---|---|
| IN RE: | § | | |
| | § | | |
| **HML ENTERPRISES, LLC** | § | Case No. 16-90030 | |
| xx-xxx0117 | § | | |
| | § | | |
| Debtor | § | Chapter 7 | |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | | |
|---|---|---|---|
| IN RE: | § | | |
| | § | | |
| **POULTRY PELLETS** | § | Case No. 16-90033 | |
| **OF ARCADIA, LLC** | § | | |
| xx-xxx5053 | § | | |
| | § | | |
| Debtor | § | Chapter 7 | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

This matter came before the Court upon hearing the "Debtor's Amended

Application Pursuant to Section 327(a) of the Bankruptcy Code and Bankruptcy Rule

2014 for an Order Authorizing the Retention and Employment of the Law Offices of

Steven M. Dowd as Attorneys for Debtor and Debtor-in-Possession Nunc Pro Tunc" filed

in the above-referenced cases by HML Enterprises, LLC ("HML") and Poultry Pellets of

Arcadia, LLC ("PPA"), respectively, in their former capacities as the Debtor-in-

---

[1] These findings of fact and conclusions of law are not designated for publication and shall not be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as to other applicable evidentiary doctrines.

Possession in their respective cases.  Each application seeks to authorize the retention of

the Law Offices of Steven M. Dowd ("Dowd") as a professional person on a *nunc pro*

*tunc* basis during the Chapter 11 phase of each respective case, both of which have since

been converted to Chapter 7.  In conjunction therewith, the Court also heard the "Motion

for Distribution of Retainer" filed by Dowd in each of the above-referenced cases, as well

as a "Motion to Compel Debtor's Counsel to Turnover Retainer to Chapter 7 Trustee"

originally filed in the PPA case by Stephen J. Zayler, during his tenure as the Chapter 7

Trustee in that case.[2]  At the conclusion of the hearing, the Court granted the parties'

request for a post-hearing submission of authorities.  The filing period for those post-

hearing submissions was extended from June 21, 2016 through August 1, 2016, and the

Court thereafter took  all of the matters under advisement.  In resolution thereof, the

Court issues the following findings of fact and conclusions of law which collectively

dispose of all issues pending before the Court.

## FINDINGS OF FACT

1.    HML filed a voluntary petition under Chapter 11 of the Bankruptcy Code on
      February 2, 2016.

2.    PPA, its wholly-owned subsidiary, did likewise two days later.

3.    Both cases were filed in a "bare-bones" fashion.  HML filed only a petition, a
      mailing matrix, and the required list of the twenty largest unsecured creditors.
      PPA filed a petition and matrix.  Its required list of twenty largest unsecured

---

[2]  Subsequent to the hearing conducted on these matters, Mr. Zayler resigned as Chapter 7
Trustee in the PPA case on June 7, 2016.  His position with regards to the turnover motion is assumed by
his replacement as Chapter 7 Trustee of the Poultry Pellets, LLC bankruptcy estate, Michael J. McNally.

creditors was filed late after the Court had issued a seven-day dismissal deadline.

4.     Approximately one week later, a *Motion of Horizon Applicators, Inc. and Genesis Industries, LLC for Adequate Protection of its (sic) Lien Against Movables and Other Property Located in Lease Property at 965 Highway 519, Arcadia, Louisiana and Adequate Protection of its (sic) Ownership Interest in Such Property* (the "Landlord Motion") was filed in the HML case.[3]

5.     The Landlord Motion revealed the existence of a pre-petition eviction lawsuit in Louisiana against both Debtors arising from an alleged breach of a 2012 lease of real property in Bienville Parish, Louisiana executed by HML.

6.     The Landlord Motion alleged that HML had improperly transferred its leasehold rights to PPA.

7.     It was during an emergency hearing conducted on February 25, 2016 upon the Debtor's Motion for Authority to Use Cash Collateral that had been filed by PPA in its case on February 19, 2016[4] (the "Cash Collateral Hearing") that the Court and parties-in-interest first learned that a sizable and potentially improper transfer of property rights from HML to PPA had occurred in the pre-petition period.

8.     The primary representative for both HML and PPA, Michael Stanaland, testified at the Cash Collateral Hearing that HML had transferred all of its manufacturing assets, including raw materials, inventory and completed product, to PPA in January 2015 for no consideration.[5]

9.     That transfer was confirmed in the HML Statement of Financial Affairs filed on March 3, 2016 which revealed that persons controlling HML had transferred assets

---

[3]  Dkt #6 filed in 16-90030.

[4]  Dkt #15 filed in 16-90033.

[5]  A transfer in that time period is subject to avoidance pursuant to 11 U.S.C. § 548(a)(1) which states, in relevant part, that:

> (a) The Trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition . . . .

11 U.S.C. § 548.  The availability of remedies under the Texas Uniform Fraudulent Transfer Act, which could be invoked by the trustee pursuant to 11 U.S.C. § 544(b).

with a scheduled value of $949,233 to PPA on January 1, 2015.[6]

10.    One day prior to the filing of that statement, on March 2, 2016, HML filed an application to employ Dowd *nunc pro tunc* as the primary bankruptcy attorney for its Chapter 11 estate pursuant to § 327(a) of the Bankruptcy Code.[7]

11.    One day later, PPA filed an almost identical application to employ Dowd in its case.[8]

12.    Each application for employment is substantially the same, even to the degree that the "Debtor" is mistakenly referenced as HML several times in the PPA application.

13.    Each application reveals that, as to each estate, Dowd would be responsible for, among other things, "[A]dvising the Debtor concerning the actions that they might take to collect and recover property for the benefit of the estates (sic)."[9]

14.    Each application stated that, as to each estate, "Dowd does not have any connection with the Debtor, its creditors, its insiders, its shareholders, or its respective attorneys or accountants, except as set forth in the Dowd Affidavit, a true and accurate copy of which is annexed hereto as Exhibit A."[10]

15.    The Dowd Affidavit filed in the HML case says nothing about his relationship to PPA.

16.    The Dowd Affidavit filed in the PPA case says nothing about his relationship to HML.

17.    Each application claimed that, as to each estate, Dowd was a "disinterested person as that term is defined in section 101(14) of the Bankruptcy Code."[11]

---

[6]  *Statement of Financial Affairs* filed in 16-90030 on March 3, 2016 [dkt #29] at 6.

[7]  Dkt #28 filed in 16-90030.

[8]  Dkt #32 filed in 16-90033.

[9]  *See supra* notes 6 and 7.

[10]  *Id.*

[11]  *Id.*

18.     Each application claimed that, as to each estate, "[N]either Dowd nor his employees hold or represent an interest adverse to the Debtor's estate."[12]

19.     Each application reveals that, as to each estate, "Dowd was paid a security retainer in the amount of $10,000 from Fertile Soils, LLC, contributed by Dr. Sid Fowler, D.D.S., Director Debtor, of (sic) which was received on January 27, 2016.[13]

20.     Each application discloses that "[S]ubject to allowance by the Court, Dowd will charge the Debtor for its legal services on an hourly basis in accordance with its ordinary and customary hourly rates as in effect on the date services are rendered."[14]

21.     Each application was accompanied by a "Verified Statement of Proposed Attorney and Disclosure Pursuant to 11 U.S.C. §§ 329 and 504 and Rules 2014(a), 2016(b), and 5002 of the Federal Rules of Bankruptcy Procedure." (the "Verified Statement").[15]

22.     The Verified Statements filed in each of the respective cases are identical.

---

[12] *Id.*

[13] *Id.* No party raised any impropriety regarding the source of the retainer paid to Dowd on behalf of each Debtor's estate. The source was fully disclosed in each application and no party challenged the proposition that each paid retainer became the property of the respective bankruptcy estate on whose behalf it was tendered. *In re Stevenson*, 2011 WL 2413172, at*5 (Bankr. D. Ariz. June 9, 2011). Dowd correctly characterized the payment as a security retainer to address future services. As the Fifth Circuit has previously noted:

> A security retainer involves fees paid to counsel for prospective services. The debtor retains an interest in the funds until the services are actually rendered. Pending the rendition of services, the attorney merely "holds" the funds for the debtor. Because the debtor retains an interest in these funds, they become property of the bankruptcy estate at filing subject to §§ 329 and 330.

*Barron v. Countryman*, 432 F.3d 590, 595-96 (5th Cir. 2005); *see also*, Dowd's *Response to Trustee's Motion to Compel Debtor's Counsel to Turnover Retainer* at 2 ["When those [retainer] funds secure representation of a prospective bankruptcy debtor, however, any unearned portion of the retainer becomes property of the debtor's bankruptcy estate upon the debtor filing for relief."].

[14] *See supra* notes 6 and 7.

[15] *Id.*

23.     Thus, as to each debtor, Dowd states under oath that "Dowd does not represent and has not represented any entity, other than the Debtor, in matters related to this Chapter 11 case."

24.     Dowd further swears that he is a disinterested person and that he does not "hold or represent any interest adverse to the Debtor's estate.[16]

25.     In each case, the Verified Statement wholly fails to disclose Dowd's representation of the other related bankruptcy estate.[17]

26.     In each case, the Verified Statement wholly fails to reveal anything about the transfers which had occurred from HML to PPA in the pre-petition period.[18]

27.     Dowd simply seeks to ignore the transfers for the purposes of determining disinterestedness and whether he holds an adverse interest with regard to each estate.

28.     Notwithstanding the fact that the Chapter 11 phase of this case was curtailed, the issue regarding whether Dowd could have qualified at any time to be hired by both bankruptcy estates is more than a hypothetical problem or a mere contrivance.

29.     It is not a latent or theoretical concern.  It is an actual conflict of interest.

30.     A cause of action exists for the potential benefit of one bankruptcy estate and to the potential detriment of the other.  Dowd cannot ethically represent both sides of this dispute.

31.     If approved as counsel for both of these bankruptcy estates, Dowd would assume an independent fiduciary duty to each estate and, with particular concern to the HML estate, such fiduciary duty would include a duty to evaluate whether any avoidance claim against PPA should be prosecuted.

32.     Under these facts, from the filing of the voluntary petition, there existed an active

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

**-6-**

competition between the two interests held by these bankruptcy estates in which one interest could only be served at the expense of the other.

33.     Each estate has diametrically opposed goals with regard to these claims.  Any attorney in Dowd's position would be precluded from providing an impartial analysis to each bankruptcy estate.

34.     As the potential counsel for each of these bankruptcy estates, Dowd would not only possess a meaningful incentive to act contrary to the best interests of each such estate, any evaluation or action that he contemplated on behalf of one estate would necessarily adversely affect the other estate.

35.     This litigation scenario between these two estates is thus the "poster child" that evidences the existence of two opposing economic interests that one attorney cannot simultaneously represent — either ethically or under the probing standards of the bankruptcy employment statutes.

36.     Whether it is economically viable for HML to pursue the avoidance litigation against its subsidiary is not germane to the issue of whether Dowd is a disinterested person or holds an adverse interest to the employing estate.

37.     In his efforts to be employed by both estates, Dowd is not a "disinterested person" as to each respective estate.  He further holds an interest adverse to each respective estate because he could not possibly tender undivided loyalty to each such bankruptcy estate and provide untainted advice and assistance to each estate.

38.     It would certainly be legally defensible to disqualify Dowd from representing either of these bankruptcy estates.

39.     However, given that this decision disqualifies him from representing both sets of opposing interests held by these two bankruptcy estates, the Court has considered whether Dowd can qualify for employment by one of the estates.

40.     While allowing Dowd to be proceed as counsel to either estate in an ongoing Chapter 11 context might otherwise have engendered ethical concerns from the perspective of his "former client," particularly in the prosecution of any avoidance action by HML against PPA, the conversion of each case to Chapter 7 mooted that problem, and any risk of ongoing harm arising from it, given that such conversion terminated Dowd's representation of either estate.

**-7-**

41.   Applying a totality of the circumstances analysis, and particularly given that Dowd will not be representing either estate on an ongoing basis, and in an effort to avoid the complete denial of compensation to Dowd in an environment in which he will not be affecting any actual decision regarding the prosecution of the HML cause of action due to the conversion of the cases, the approval of his employment by one estate for the limited period of time that these cases remained in Chapter 11 is appropriate.

42.   Given that the managers and officers who sanctioned the substantial transfer of assets from HML to PPA without the transfer of value employed Dowd, it is more appropriate to approve the Dowd representation of PPA rather than allowing him to represent HML which holds the potential right to reverse that transfer for the benefit of its creditors.

*PPA Motion for Distribution of Retainer*

43.   As outlined therein, and in light of the conversion of the case to Chapter 7, it is proper for the Court to review the Motion for Distribution of Retainer filed in the PPA case (the "PPA Retainer Motion") as an application for interim compensation under § 331 of the Bankruptcy Code to determine Dowd's entitlement to all or any part of the PPA retainer.

44.   The PPA application to employ Dowd as its primary bankruptcy attorney makes no reference to the rendition of accounting services.

45.   Though there are references in the PPA Retainer Motion to the rendition of accounting services, a close examination of the time records reveals that these services related to the procurement of financial information necessary for the preparation of the PPA schedules and statements and are therefore compensable.

46.   The Court has reviewed the PPA Retainer Motion and determined whether the services and expenses as outlined therein by Dowd were actual, reasonable and necessary in representing the interests of the Debtor-in-Possession.

47.   A reduction of 7.00 attorney hours and 10.25 paraprofessional hours is justified for excessive time having been billed for the work described.

48.   A reduction of 7.00 paraprofessional hours is justified for services which improperly or unnecessarily duplicate compensable services performed by the attorney retained by the Estate.

49.  A reduction of 4.00 paraprofessional hours is justified for services rendered on behalf of this Estate for which the benefit to the Estate is unclear or undemonstrated.

50.  A reduction of 21.80 hours of paraprofessional time is justified for charges made for clerical-type services, including the electronic filing of documents, which are properly characterized as an overhead item.

51.  Notwithstanding the foregoing deductions, the lodestar calculation pertaining to the professional services rendered by Dowd in the PPA case exceeds the $10,000.00 sought to be drawn by Dowd pursuant to the PPA Retainer Motion.

52.  Because Dowd is entitled to drawdown the PPA retainer, no grounds have been established by which to grant the Motion To Compel Debtor's Counsel to Turnover Retainer to Chapter 7 Trustee in the PPA case.

53.  To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

## *CONCLUSIONS OF LAW*

1.  The Court has jurisdiction to consider this contested matter pursuant to 28 U.S.C. §§ 1334 and 157.

2.  This Court has authority to enter a final order in this contested matter, as it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A), (B), and (O) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

3.  "The Bankruptcy Code imposes particularly rigorous conflict-of-interest restraints upon the employment of professional persons in a bankruptcy case." *Rome v. Braunstein*, 19 F.3d 54, 57 (1st Cir. 1994); *In re TAGT, L.P.*, 393 B.R. 143, 155–56 (Bankr. S.D. Tex. 2006) ["It is well established that a debtor-in-possession's counsel must have a single master."].

4.  A debtor serving as a debtor-in-possession in a Chapter 11 case may employ only attorneys "that do not hold or represent an interest adverse to the estate, and that

are disinterested persons."  11 U.S.C. § 327(a).[19]

5.     These requirements "serve the important policy of ensuring that all professionals
       appointed pursuant to section 327(a) tender undivided loyalty and provide
       untainted advice and assistance in furtherance of their fiduciary responsibilities,"
       *Rome,* 19 F.3d at 58; *Kravit, Gass & Weber, S.C. v. Michel (In re Crivello)*, 134
       F.3d 831, 836 (7th Cir. 1998).[20]

6.     Notwithstanding the lack of any objection, the Court has an independent duty to
       inquire into the qualifications of counsel for debtor in possession under § 327(a).
       *In re Git-N-Go, Inc.*, 321 B.R. 54, 59 (Bankr. N.D. Okla. 2004) (citing *Interwest
       Bus. Equip., Inc. v. U.S. Trustee (In re Interwest Bus. Equip., Inc.),* 23 F.3d 311,
       316 (10th Cir. 1994).

7.     Section 327(a) thus invokes a two-prong test to determine whether a particular
       professional is qualified to act on behalf of a bankruptcy estate: (1) that
       professional must not hold nor represent any interest which is adverse to the estate;
       and (2) that professional must be a "disinterested person."

---

[19]   Section 327(a) of the Bankruptcy Code provides, in relevant part, that

> . . . the trustee, with the court's approval, may employ one or more
> attorneys, accountants, appraisers, auctioneers, or other professional
> persons, that do not hold or represent an interest adverse to the estate,
> and that are disinterested persons, to represent or assist the trustee in
> carrying out the trustee's duties under this title.

11 U.S.C.A. § 327 (West 2004).  To "represent," as opposed to holding, an adverse interest "means to
serve as agent or attorney for any individual or entity holding such an adverse interest."  *In re 7677 E.
Berry Ave. Assoc., L.P.*, 419 B.R. 833, 842 (Bankr. D. Colo. 2009) (citing *In re Roberts,* 46 B.R. 815, 827
(Bankr. D. Utah 1985)).

[20]   These requirements are implemented through the disclosures mandated by Fed. R. Bankr. P.
2014, including the required disclosure of the connections which the proposed professional has with the
debtor, creditors, and other designated parties-in-interest.  This affirmative duty forces a proposed
professional to reveal any interest which may be antagonistic or opposite to the interest of the estate.  In
this instance, though the proposed attorney failed in each instance to make appropriate disclosures, and
though that failure could certainly be the basis to order forfeiture of all requested compensation, that
failure did not result in any actual loss to the HML estate and the conversion of the case has ended
Dowd's engagement on behalf of the estates.   Thus, no further sanctions for lack of disclosure will be
imposed.

8.      There is no *per se* rule requiring the disqualification of an attorney seeking to represent two related bankruptcy estates. *See, e.g., In re Huddleston*, 120 B.R. 399, 402-03 (Bankr. E.D. Tex. 1990) [representation of closely-held corporation and sole or majority shareholder not subject to *per se* prohibition].

9.      Courts have generally avoided imposing such bright-line prohibitions in favor of a totality of the circumstances approach in which a court may evaluate each case on its particular facts. *Waldron v. Adams & Reese, LLP (In re Am. Int'l Refinery, Inc.)*, 676 F.3d 455, 462 (5th Cir. 2012); *In re Hutch Holdings, Inc.*, 532 B.R. 866, 877 (Bankr. S.D. Ga. 2015); *In re Ampal-Am. Israel Corp.*, 534 B.R. 569, 580 (Bankr. S.D.N.Y. 2015) ["The Court must make the determination whether a proposed professional holds or represents an adverse interest on a case-by-case basis giving due consideration to the totality of the circumstances."].

10.     The Bankruptcy Code does not define "an interest adverse to the estate."

11.     The term "disinterested person" is defined in § 101(14) of the Bankruptcy Code.[21]

12.     The definition of "disinterested person" incorporates the adverse interest requirement, thereby creating an overlap within § 327(a) regarding the applicability of these standards. *Am. Int'l Refinery, Inc.*, 676 F.3d at 462 n.7 [finding that the term "adverse interest" in the two sections is "generally considered to have the same meaning"]; *In re LTHM Houston Operations, LLC*, 2014 WL 5449737, at *2 (Bankr. S.D. Tex. Oct. 24, 2014).

13.     "[T]he adverse interest test is objective and precludes any interest or relationship, however slight, that would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." *In re JMK Constr. Group, Ltd.*, 441 B.R. 222, 229 (Bankr. S.D.N.Y. 2010) (internal quotations omitted).

14.     The Fifth Circuit has followed substantial jurisprudence in developing a standard that a professional person holds an adverse interest if he or she either:

---

[21] In relevant part, 11 U.S.C. § 101(14) defines a "disinterested person" as a person that —

* * *

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the debtor, or for any other reason.

> (1) possesses or asserts any economic interest that would tend
> to lessen the value of the bankruptcy estate or that would
> create either an *actual or potential* dispute with the estate as a
> rival claimant; or
>
> (2) possesses a predisposition of bias against the estate.

*In re West Delta Oil Co.,* 432 F.3d 347, 356 (5th Cir. 2005) (emphasis added).

15.     "The concept of adverse interest has also been articulated in terms of motivation: whether the attorney possesses a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors." *In re Martin*, 817 F.2d 175, 180-81 (1st Cir. 1987); *In re Age Refining, Inc*., 447 B.R. 786, 802 (Bankr. W.D. Tex. 2011).

16.     An actual conflict of interest exists when dual representation forces an attorney to advance two diametrically opposed goals and deprives each represented party of "unbiased, independent assessments of the available and outstanding claims." *Quarles & Brady, LLP v. Maxfield (In re Jennings)*, 199 F. App'x 845, 849 (11th Cir. 2006).

17.     "An actual conflict is said to exist when there is an active competition between two competing interests, in which one interest can only be served at the expense of the other. A potential conflict is said to be one in which the competition is presently dormant, but may become active if certain contingencies occur." *In re Adam Furniture Indus., Inc*., 158 B.R. 291, 301 (Bankr. S.D. Ga. 1993) (internal quotations omitted).

18.     "Section 327(a), as well as § 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest. . . ." *In re Marvel Entm't Group, Inc*., 140 F.3d 463, 476 (3d Cir. 1998).

19.     However, "[p]otential conflicts, no less than actual ones, can provide motives for attorneys to act in ways contrary to the best interests of their clients. Rather than worry about the potential/actual dichotomy, it is more productive to ask whether a professional has either a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors — an incentive sufficient to place those parties at more than acceptable risk — or the reasonable perception of one." *In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994) (citing *Martin*, 817 F.2d at 181).

20.     "In other words, if it is plausible that the representation of another interest may
        cause the debtor's attorneys to act any differently than they would without that
        other representation, then they have a conflict and an interest adverse to the
        estate." *Id.*; *In re Quality Beverage Co., Inc.*, 216 B.R. 592, 595 (Bankr. S.D. Tex.
        1995).

21.     "Courts have recognized that conflicts waivers are not effective for purposes of
        satisfying the adverse interest requirement of section 327(a) of the Bankruptcy
        Code." *JMK Constr. Group, Ltd.*, 441 B.R. at 237.

22.     This approach in discerning the existence of an adverse interest is consistent with
        that recognized in attorney ethics decisions under Texas law.

23.     "What constitutes 'adversity' is not defined in the Bankruptcy Code and, although
        arguably a federal question, is informed by reference to the ethical rules of the
        legal profession governing adversity in a manner that is analogous to the
        imposition of attorney discipline by federal courts, which do not have the benefit
        of uniform federal procedure." *In re Kobra Properties*, 406 B.R. 396, 403 (Bankr.
        E.D. Cal. 2009).

24.     "In deciding whether an attorney holds an interest adverse to the estate, courts
        have looked for guidance to the Code of Professional Responsibility." *In re
        SBMC Healthcare, LLC*, 473 B.R. 871, 877 (Bankr. S.D. Tex. 2012).

25.     Texas disciplinary rule 1.06(a) states it simply:  "A lawyer shall not represent
        opposing parties to the same litigation." Tex. Disciplinary Rules Prof'l Conduct
        R. 1.06(a), reprinted in 3B TEX. GOVT. CODE ANN., tit. 2, subtit. G, app. A at 102
        (West 2013).

26.     The accompanying comment to Rule 1.06 is insightful in this analysis: "The term
        'opposing parties' as used in this Rule contemplates a situation where a judgment
        favorable to one of the parties will directly impact unfavorably upon the other
        party." *Id.* at cmt. 2.

27.     "[R]epresenting one client is directly adverse to another client when the lawyer's
        ability or willingness to consider, recommend, or carry out a course of action will
        be or is reasonably likely to be adversely affected by representing both clients.*" In
        re Seven-O Corp.*, 289 S.W.3d 384, 390 (Tex. App.— Waco 2009, orig.
        proceeding).

28.     Thus, regardless of which phrase within § 327(a) is utilized, the adverse interest
        standard is a rigorous one and is sufficiently broad to include any professional
        "who in the slightest degree might have some interest or relationship that would
        color the independent and impartial attitude required by the Code." *Pierson &
        Gaylen v. Creel & Atwood (In re Cons. Bancshares, Inc.),* 785 F.2d 1249, 1256
        (5th Cir. 1986); *LTHM Houston Operations, LLC,* 2014 WL 5449737, at *2.

29.     These employment standards are critical because "[a]ctual and potential conflicts
        of interests between attorneys employed by the estate and the estate itself can
        impact the integrity of the bankruptcy system as a whole." *In re Barkany*, 542
        B.R. 699, 713 (E.D.N.Y. 2015).

30.     Accordingly, "[t]he standards for finding a conflict are strict and attorneys engaged
        in the conduct of a bankruptcy case should be free of the slightest personal interest
        which might be reflected in their decisions concerning matters of the debtor's
        estate or which might impair the high degree of impartiality and detached
        judgment expected of them during the course of administration." *Am. Int'l
        Refinery, Inc.*, 676 F.3d at 462.

31.     "The determination of an adverse interest must be made with an eye to the specific
        facts of each case." *Id.*; *see also Age Refining*, 447 B.R. at 803.

32.     "The Court cannot use its equitable powers to approve the employment of a
        professional who is not disinterested even if it determines that employment is in
        the best interests of all parties and even if such employment is the most efficient
        and economical way to proceed with [the] administration of the case.*" In re
        Licking River Mining, LLC*, 2015 WL 5601284, at *6 (Bankr. E.D. Ky. Sept. 22,
        2015).

33.     The enforcement of these standards is critical because "[a]ctual and potential
        conflicts of interests between attorneys employed by the estate and the estate itself
        can impact the integrity of the bankruptcy system as a whole." *Barkany*, 542 B.R.
        at 713.

34.     This is particularly important in the context of a Chapter 11 case in which
        preexisting management continues to govern the affairs of a debtor and
        disinterested persons are not automatically appointed to take control over a
        bankruptcy estate.

-14-

35.   Therefore, notwithstanding the lack of any objection, the Court has an independent duty to inquire into the qualifications of counsel for debtor in possession under § 327(a).  *Git-N-Go, Inc*., 321 B.R. at 59; *In re Penney*, 334 B.R. 517, 520 (Bankr. D. Mass. 2005;); *In re Am. Energy Trading, Inc*., 291 B.R. 154, 158 (Bankr. W.D. Mo. 2003) ["A bankruptcy court has the authority and the responsibility to approve the employment only of professionals who meet the minimum requirements set forth in § 327(a), independent of objections."].

36.   "Even though [a] law firm acts as attorney for the debtor-in-possession, it also has certain fiduciary duties to the estate, including insuring that the rights of the creditors are protected.  This protection extends to a good faith impartial analysis by counsel for the debtor-in-possession of whether to devote assets of the estate to the pursuit of potential preferential transfers or fraudulent conveyances for the ultimate benefit of estate creditors."  *Adam Furniture Indus., Inc*., 158 B.R. at 301.

37.   The possible need for a law firm to act against certain insider transferees in a preferential transfer avoidance or fraudulent conveyance recovery action is a circumstance that constitutes a disqualifying bias against the bankruptcy estate and precludes employment under § 327.  *Id.* at 302.

38.   As one court described this scenario,

> It is the duty of counsel for the debtor in possession to survey the landscape in search of property of the estate, defenses to claims, preferential transfers, fraudulent conveyances and other causes of action that may yield a recovery to the estate. The jaundiced eye and scowling mien that counsel for the debtor is required to cast upon everyone in sight will likely not fall upon the party with whom he has a potential conflict.

*Git-N-Go, Inc*., 321 B.R. at 59.

39.   Pre-petition transfers of substantially all of the assets of a debtor to related entities in the face of adverse action by creditors precludes the employment of the same attorney for the debtor's estate and its potential avoidance defendant.  *In re N. John Cunzolo Assoc., Inc*., 423 B.R. 735, 739 n.5 (Bankr. W.D. Pa. 2010).

40.   "Under Section 328(c), a court may deny compensation for services provided by an attorney who holds such an adverse interest," though the court retains discretion

on that issue.  *Am. Int'l Refinery*, 676 F.3d at 462 (citing *West Delta Oil*, 432 F.3d at 354-55).

41.    "The bankruptcy court may exercise its discretion, upon motion or sua sponte, to award compensation that is less than the amount ... requested."  *In re Cmty. Home Fin. Services, Inc.*,  2015 WL 6511183, at *7 (Bankr. S.D. Miss. Oct. 27, 2015) (internal quotations omitted).

42.    Because Dowd is not a disinterested person and because he holds an interest adverse to the HML estate, the Amended Application to Employ the Law Offices Steven M. Dowd as Attorneys for the Debtor-in-Possession (Nunc Pro Tunc) filed by HML Enterprises, LLC, as the former debtor-in-possession in case no. 16-90033 **[dkt #62]**, is denied.

43.    Since no compensation can properly be paid to any attorney who is ineligible to be employed by the estate under § 327(a), the Motion for Distribution of Retainer filed by the Law Offices of Steven M. Dowd **[dkt #69]** in the HML Enterprises, LLC case, case no. 16-90030, is denied.

44.    The Law Offices of Steven M. Dowd is ordered to return the $10,000.00 retainer that it received from HML Enterprises, LLC to Stephen J. Zayler, Trustee of the Chapter 7 Estate of HML Enterprises, LLC within 14 days.

45.    The Amended Application to Employ the Law Offices of Steven M. Dowd as Attorneys for the Debtor-in-Possession (Nunc Pro Tunc) filed by Poultry Pellets of Arcadia, LLC, as the former debtor-in-possession in case no. 16-90033 **[dkt #52]**, is granted and the employment of the Law Offices of Steven M. Dowd as primary bankruptcy counsel for Poultry Pellets of Arcadia, LLC in the Chapter 11 phase of the bankruptcy case of Poultry Pellets of Arcadia, LLC, case no. 16-90033, is hereby approved, *nunc pro tunc* as of February 4, 2016.

46.    The Motion for Distribution of Retainer filed by the Law Offices of Steven M. Dowd in the Poultry Pellets of Arcadia, LLC case **[dkt #79]**, pertaining to services rendered by Dowd in the Chapter 11 phase of the PPA case, is hereby granted and the Law Offices of Steven M. Dowd is authorized to withdraw the $10,000.00 PPA retainer and place such sums in its operating account.

47.    The Motion to Compel Debtor's Counsel to Turnover Retainer to Chapter 7 Trustee originally filed in the bankruptcy case of Poultry Pellets of Arcadia, LLC, case no. 16-90033 **[dkt #89]**, by Stephen J. Zayler, who then served as Trustee of

the Chapter 7 Estate of Poultry Pellets of Arcadia, LLC, and who has now been succeeded by Michael J. McNally in that trustee capacity, is denied.

48.     To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

49.     Appropriate orders shall be entered consistent with these findings and conclusions.


Signed on 10/12/2016


THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE